[Cite as *Flagstar Bank, FSB v. Cintron*, 2012-Ohio-5914.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

FLAGSTAR BANK, FSB                    :
                                      :    Appellate Case No. 25110
    Plaintiff-Appellee          :
                                      :    Trial Court Case No. 2011-CV-509
v.                                    :
                                      :
FRANCISCO CINTRON, JR., et al.        :    (Civil Appeal from
                                      :     Common Pleas Court)
    Defendant-Appellants        :
                                      :

. . . . . . . . . . .

## O P I N I O N

Rendered on the 14th day of December, 2012.

. . . . . . . . . . .

SCOTT A. KING, Atty. Reg. #0037582, and JESSICA E. SALISBURY, Atty. Reg. #0085038, Thompson Hine LLP, 2000 Courthouse Plaza, N.E., Post Office Box 8801, Dayton, Ohio 45401
    Attorney for Plaintiff-Appellee

TROY J. DOUCET, Atty. Reg. #0086350, and AUDRA LEPI TIDBALL, Atty. Reg. #0087764, Doucet & Associates, LLC, 4200 Regent Street, Suite 200, Columbus, Ohio 43219
    Attorney for Defendant-Appellants

. . . . . . . . . . . .

HALL, J.

{¶ 1}    Francisco and Beth Cintron appeal from the trial court's entry of summary

judgment in favor of appellee Flagstar Bank on the bank's foreclosure complaint. The Cintrons also appeal from the trial court's entry of summary judgment in favor of Flagstar on their counterclaims under the federal Truth-in-Lending Act ("TILA").

{¶ 2} The Cintrons advance five assignments of error on appeal. The first three concern the trial court's rulings regarding the Cintrons' TILA counterclaims. The basis for the counterclaims was Flagstar's alleged failure to provide Francisco and Beth Cintron each with two copies of a notice of right to cancel when they refinanced their home mortgage in 2009. In their first assignment of error, the Cintrons contend the trial court erred in awarding Flagstar summary judgment on the counterclaims because they presented overwhelming evidence to rebut a statutory presumption in Flagstar's favor regarding the number of copies they received. In their second assignment of error, the Cintrons claim the trial court erred in not finding deposition testimony sufficient to overcome the presumption that they each received two copies of the notice of right to cancel. In their third assignment of error, the Cintrons contend the trial court erred in overruling their own motion for summary judgment on the TILA counterclaims.

{¶ 3} The Cintrons' fourth and fifth assignments of error concern the trial court's entry of summary judgment in favor of Flagstar on its complaint for foreclosure. In their fourth assignment of error, the Cintrons contend the trial court erred in awarding Flagstar summary judgment where the bank did not comply with conditions precedent in the mortgage document. In their final assignment of error, the Cintrons claim the trial court erred in awarding Flagstar summary judgment where a genuine issue of material fact exists regarding the balance due on the note.

{¶ 4}    The facts underlying the parties' dispute are summarized in the trial court's ruling as follows:

On August 14, 2007, the Cintrons executed a Note to finance their purchase of certain real property located at 1031 Gleason Drive, Riverside, Ohio 45424 (the "Property").

Approximately 18 months later on February 5, 2009, and as part of an effort to refinance the Property, the Cintrons submitted their completed Uniform Residential Loan Application which included a document signed by them and entitled "SERVICING DISCLOSURE STATEMENT NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICATIONS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED" ("Servicing Disclosure"). By signing the Servicing Disclosure, the Cintrons acknowledged receipt of a copy of this document.

During his deposition, Francisco Cintron admitted that the signature on the Servicing Disclosure "appeared to be his," but he could not specifically recall whether he actually signed the document or received a copy of it. During her deposition, Beth Cintron admitted her handwriting and signature were on the Servicing Disclosure.

Thereafter, at a March 17, 2009 closing ("the Closing"), the Cintrons refinanced the Property by executing a note in Flagstar's favor. The Cintrons also executed a mortgage for the Property naming Flagstar as the mortgagee. As part of the Closing, the Cintrons received a "Notice of Assignment, Sale or

Transfer of Servicing Rights" ("Notice of Assignment"), notifying them that Flagstar would service their loan.

At the Closing, the Cintrons also signed a document entitled "LOAN CLOSING DISCLOSURE ACKNOWLEDGMENTS" ("LCDA") which *unequivocally* stated: "We certify . . . that we received the Special Information Booklet at the time of our mortgage application; that we received a Good Faith Estimate of settlement costs and that each borrower received a copy of the Truth in Lending Disclosure within three days of our mortgage application."

Regarding the LCDA, Francisco Cintron admitted during his deposition that his signature appeared to be on the LCDA. He further admitted that if he signed the LCDA, he would have read it. Beth Cintron acknowledged that her signature was on the Loan Closing Disclosure Form, but she could not remember if she read it before signing.

Flagstar and the Cintrons agree that, during the Closing, the Cintrons signed the "Notice of the Right to Rescind" ("NORTC") which stated quite clearly above the signature lines: "**ON THIS DATE THE UNDERSIGNED EACH RECEIVED TWO (2) COMPLETED COPIES OF THE NOTICE OF OPPORTUNITY TO CANCEL**" (emphasis added).

To their credit, the Cintrons agree that they read the NORTC *before* signing, and the NORTC contained the aforementioned acknowledgment, thereby admitting receiving two copies of the NORTC each. Nevertheless, and curiously, the Cintrons both testified during their depositions that each only

received one copy of the NORTC at the Closing. So it goes.

On May 19, 2009, Flagstar sold the right to receive a portion of the payments under the Note to the Governmental National Mortgage Association ("Ginnie Mae"). Nevertheless, at all relevant times, Flagstar has retained possession of the Note, remained its payee and serviced the Note.

In March 2010, the Cintrons moved to Port St. Lucie, Florida, and abandoned the Property. In response to the Cintrons' inquiry about a possible short sale, Flagstar sent them an August 19, 2010 letter requesting certain financial information. The Cintrons failed to provide the requested financial information.

The Cintrons subsequently stopped paying the mortgage payments and their account fell into default. Flagstar sent letters to the Cintrons on August 26, 2010, September 3, 2010, September 10, 2010, September 17, 2010, September 18, 2010, and October 20, 2010, advising the Cintrons of their account's serious delinquency. These letters included a Notice of Acceleration, a date for the Cintrons to cure their default, and warnings of a sale and how to avoid foreclosure. The Cintrons acknowledge receiving these letters.

On January 20, 2011, Flagstar commenced the instant action to recover the balance due on the Note and to foreclose the Mortgage. Flagstar asserts the Cintrons never cured their default, and owe $219,816.08, plus interest at the rate of 5.50% per annum from August 1, 2010.

On February 3, 2011, the Cintrons attempted to rescind the refinancing

by sending a certified letter and e-mail to Flagstar. On February 19, 2011, the Cintrons received a third-party offer to purchase the Property for $178,000. On March 4, 2011, the Cintrons filed their Answer and Counterclaim asserting claims for: equitable estoppel and violations of the Truth in Lending Act ("TILA"), the Real Estate Settlement Procedures Act ("RESPA"), the Consumer Sales Practices Act ("CSPA") and the Fair Debt Collection Practices Act ("FDCPA").

On September 23, 2011, Janet Pogliano Reder, Vice-president of Operations for Flagstar Bank, testified the amount due on the Note is $219,816.08, and produced supporting documentation including payment histories and other financial data verifying that amount. During her deposition, Ms. Reder produced a copy of Flagstar's Mortgage Compliance Guide which included Flagstar's policy on RESPA and TILA.

On November 15, 2011, Todd Mendolia, corporate representative of LSI Lender Processing Services Company ("LSI"), testified that Flagstar provided the closing documents electronically to LSI along with written instructions. LSI does not review closing documents for compliance with federal law. The notary or signing agent would provide the loan closing documents to the Cintrons for their signature, not LSI. Mendolia understandably could not testify how many copies of the various documents the notary printed out for the Cintrons to sign.

On January 10, 2012, during its telephone conference with counsel for

Flagstar and the Cintrons, the Court confirmed that both parties had completed all discovery necessary to the Court's determination of their dispositive motions and that neither party intended to depose the notary present at the Closing on the Cintrons' refinancing at issue here.

(Feb. 14, 2012, Decision, Entry, and Order at 1-5) (footnotes with citations omitted).

{¶ 5}   After reciting the facts, the trial court turned to the Cintrons' TILA counterclaims. It rejected their argument that Flagstar had violated TILA by not providing each of them with two copies of the notice of right to cancel. The trial court held that the Cintrons had failed to overcome a presumption of delivery that arose when they each signed a form acknowledging receipt of two copies of the notice. Therefore, the trial court found that the Cintrons had only three days, not three years, to rescind their mortgage. It reasoned:

Typically, TILA permits a borrower to rescind a mortgage transaction within three days of the closing. However, if the required notice or material disclosures are not delivered, the borrower's right to rescind "shall expire three years after the date of consummation." And TILA requires a creditor to "deliver two copies of the NORTC to each consumer entitled to rescind." Here and to their credit, the Cintrons each admitted receiving and reading the NORTC *before* they signed it. By signing the NORTC, the Cintrons acknowledged that *each* received two copies of the NORTC, thereby creating a rebuttable presumption that they received the required four copies, and their bare bones, self-serving denials to the contrary are *not* sufficient to rebut [15 U.S.C. section] 1635(c)'s statutory presumption. Indeed, the Sixth Circuit and other

federal courts in this district have held that a borrower's own *post h[o]c* denial of receipt of NORTC in affidavit testimony is, as a matter of law, insufficient to rebut the statutory presumption.

The only evidence the Cintrons offer to rebut the presumption of proper delivery of the NORTC at the Closing is: 1) Flagstar has but one copy of the NORTC in its records - but neither statutory nor case law required Flagstar to keep multiple copies of the NORTC; and 2) neither Flagstar VP Ms. Reder nor LSI corporate representative Mendolia could say how many copies of the NORTC the Cintrons received from the notary at the Closing – but this is hardly surprising since neither Reder or Mendolia were present at the Closing.

Interestingly, *the Cintrons ultimately chose not to depose the notary*, the *only* person who could have salient and relevant information that could have, perhaps, rebutted the presumption of proper delivery of the NORTC as required by TILA.

While TILA's provisions are remedial in nature, and should be "given a broad, liberal construction in favor of the consumer" the Cintrons would "rebut" the delivery presumption in Flagstar's favor by requiring Flagstar to provide affirmative proof of delivery at the Closing of four copies of the NORTC, thus eviscerating by judicial fiat TILA's delivery presumption in Flagstar's favor. This the Court will not do. Rather, the Court finds that the Cintrons' TILA rescission rights expired on March 20, 2009 and that no genuine issues of material fact remain on this issue.

(Decision, Entry, and Order at 5-6) (footnotes with citations omitted).

{¶ 6}     After disposing of the TILA counterclaims,[1] the trial court turned to Flagstar's foreclosure complaint.   It rejected the Cintrons' argument that Flagstar had failed to comply with all conditions precedent to foreclosure:

> The Cintrons attempt to avert foreclosure by claiming that Flagstar failed to comply with all conditions precedent to recover under the terms contained in the Mortgage; specifically, by failing to include the language "foreclosure by judicial proceeding" in its correspondence to the Cintrons.
>
> Flagstar, via affidavit, presented evidence that the Cintrons were sent at least six letters advising of their default. Specifically, Flagstar letters dated September 17 and 18, 2011 advised the Cintrons: "You have thirty (30) days from the date of this letter to make your overdue payment. If you fail to cure this default, Flagstar may accelerate your indebtedness by declaring the entire amount due and payable immediately." The same letters go on to state: "Flagstar may invoke the power of sale and any other remedies permitted *under applicable law* . . ." (emphasis added). Those same letters inform the Cintrons how to avoid "foreclosure" and how to contact the Department of Housing and Urban Development.
>
> The Court finds to be hyper-technical and non-existent in law the Cintrons' argument that Flagstar somehow is thwarted herein because its letters

---

[1] In addition to the TILA counterclaims, the trial court entered summary judgment in favor of Flagstar on the Cintrons' counterclaims under the Real Estate Settlement Procedures Act, the Consumer Sales Practices Act, and the Fair Debt Collection Practices Act. These other counterclaims are not at issue on appeal.

to the Cintrons did not specifically state they faced "foreclosure by judicial proceeding". The Cintrons have failed to cite the Court to any salient statutory or case law supporting their argument. And for good reason – no such law exists.

(*Id*. at 7-8).

{¶ 7} The trial court also rejected an argument that Flagstar had not proven the amount due under the note. It reasoned:

The Cintrons blithely claim Flagstar improperly assessed charges and fees, but have ***not*** offered a scintilla of evidence to substantiate this claim. Indeed, the Cintrons' affidavits are strangely silent on this very issue. Additionally, Flagstar was under no obligation to accept a short sale offer. The Cintrons have failed to meet the burden shifted to them under Civ.R. 56 and no genuine issues of material fact preclude summary judgment in Flagstar's favor.

(*Id.* at 9).

{¶ 8} The Cintrons' first three assignments of error challenge the trial court's ruling on their TILA counterclaims. In their first two assignments of error, which they have briefed and argued together, the Cintrons contend they rebutted the presumption of delivery that arose when they signed a document acknowledging receipt of two copies of the notice of right to cancel. At a minimum, then, the Cintrons claim a genuine issue of material fact exists regarding how many copies of the notice they received. In their third assignment of error, the Cintrons insist that the evidence so overwhelmingly established their receipt of just one copy of the notice that the trial court erred in not entering summary judgment for them on their

TILA counterclaims.

{¶ 9}     In response to the Cintrons' arguments, Flagstar contends their execution of an acknowledgment of delivery created a presumption that they received two copies of the notice of right to cancel. Flagstar asserts that the Cintrons failed to rebut the presumption and create a genuine issue of material fact for trial. In any event, Flagstar reasons that whether the Cintrons received one or two copies of the notice is immaterial because they admitted receiving the notice and having an opportunity to read it. The Cintrons counter that even technical violations of TILA—including the requirement to provide each borrower with two copies of a notice of right to cancel—are actionable. The Cintrons insist that Flagstar's failure to provide them each with two copies of the notice extended their rescission period from three days to three years.

{¶ 10}     TILA gives consumers a right to rescind transactions secured by their "principal dwelling."   15 U.S.C. section 1635(a). A creditor is required to give consumers notice of this right in accordance with certain implementing regulations. *Id*. Those regulations have been codified at 12 C.F.R. section 226 and are known collectively as "Regulation Z." A consumer's right to rescind is governed by 12 C.F.R. section 226.23. It provides that the right to rescind may be exercised "until midnight of the third business day following consummation, *delivery of the notice required by paragraph (b) of this section*, or delivery of all material disclosures, whichever occurs last." 12 C.F.R. section 226.23(a)(3) (emphasis added).

{¶ 11}     The "notice required by paragraph (b)" mentioned in 12 C.F.R. 226.23(a)(3) is addressed in 12 C.F.R. 226.23(b)(1). It provides that "[i]n a transaction subject to rescission, a

creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind * * *." *Id.* "If the required notice * * * [is] not delivered, the right to rescind shall expire 3 years after consumption * * *." 12 C.F.R. section 226.23(a)(3). Finally, a borrower's written acknowledgment of receipt of two copies of the required notice creates a rebuttable presumption of delivery. 15 U.S.C. section 1635(c).

{¶ 12} The Cintrons both admit signing an acknowledgment of receipt by each of two copies of the notice of right to cancel. They argue, however, that they presented enough evidence below to rebut the statutory presumption. In their appellate brief, the Cintrons cite the following evidence to support their argument:

> * * * [I]n addition to their own testimony and affidavits, the Cintrons presented ample evidence to establish that they were not provided four copies of the NOTRC. Flagstar admitted that only one copy of the NORTC signed by both borrowers was included in the executed closing documents returned by the title agency to Flagstar after the Cintrons' closing. (Deposition of Corporate Representative of Flagstar Bank, FSB, Janet Pogliano Reder, Vice President of Operations ("Flagstar Dep."), at 20-21). Flagstar reviewed the closing instructions generated with the loan closing package for the settlement agent and nowhere in those instructions did it direct any multiple copies to be made of the NOTRC. (*Id*. at 23-24). The checklist printed with the closing package indicated that the NOTRC was required, however, it did not indicate that there were to be two per borrower, nor did it direct the settlement agent to make copies. (*Id*. at 25). Upon examining copies of the closing documents generated

by Flagstar's system and forwarded to the settlement agent in this case, Flagstar was only able to identify one copy of the NOTRC in those documents. (*Id*. at 16-19).

Additionally, no one at Flagstar reviews the documents for compliance with TILA prior to forwarding the documents to the settlement agent. (*Id*. at 27-28). The post-closing review for errors conducted by Flagstar only looks to determine that each borrower on the transaction acknowledged and signed the NOTRC. (*Id*. at 51). The error review will be satisfied even if there was only one NOTRC signed by both borrowers, as is the case here. (*Id*. at 52). Flagstar does not actually verify the correct number of copies of the NOTRC are received as a part of its post-closing review. (*See id*.). This substantiates the claims made in the Cintrons' affidavits that they never received the required four copies. (Aff. Of Francisco Cintron, at ¶12; Aff. of Beth Cintron, at ¶12).

The Cintrons also deposed a representative of the title company in this case—LSI Lender Processing Services Company ("LSI"). LSI is the settlement services provider that received the Cintrons' loan closing documents directly from Flagstar in this case, and whose agent presented the closing documents to the Cintrons at closing. (Deposition of Corporate Representative of LSI Lender Processing Services Company, Todd Mendolia, Senior Vice President of Operations ("LSI Dep."), at 8-9; 11-14; 22-23). Mr. Mendolia indicated that LSI received loan closing instructions from Flagstar in conjunction with the Cintrons' closing and that LSI would have reviewed those instructions and

provided any items that were requested from the lender. (*Id*. at 18-20). The loan closing instructions do   not indicate that any copies should be made of the NOTRC beyond the one included with the closing package. (*Id*.; Defendants' Motion for Partial Summary Judgment, Exhibit 7 ("Exhibit 7"). Further, Mr. Mendolia testified that LSI would not make multiple copies of any document it received from a lender unless it was instructed to do so in the closing instructions. (LSI Dep. at 22). No such instructions were present here. Additionally, LSI does not review the documents it receives from lenders for compliance with federal law. (*Id*. at 21-22). Included within the closing documents that LSI received from Flagstar in this case is only one copy of the NOTRC. (*Id*. at 25).

> Further, to Mr. Mendolia's knowledge, LSI did not instruct the closing agent in this case (a notary) to make additional copies of any documents, and if any such instruction was given, it would have been in writing. (*Id*. at 23-24). No written instructions exist in the instructions provided to the notary in this case. (*See id.*; Defendants' Motion for Partial Summary Judgment, Exhibit 8 ("Exhibit 8"). Generally, after the documents are signed, the notary returns the documents to LSI, and LSI images the documents. (LSI Dep. at 48;

51). In this case, after the closing, LSI returned the documents, including only one copy of the NOTRC, to Flagstar. (*Id*. at 31). This testimony is consistent with Ms. Reder's testimony that included in the executed closing documents returned by LSI to Flagstar after the Cintrons' closing was only one copy of the NOTRC signed by both borrowers. (Flagstar Dep. at 20-21). Mr. Mendolia also testified that, to his knowledge, no closing documents were provided to the Cintrons before or after their closing date on March 17, 2009. (LSI Dep. at 37).

(Appellants' Brief at 9-11).

{¶ 13} In a motion for summary judgment, the moving party bears the burden to demonstrate, *inter alia*, that there is no genuine issue of material fact Civ.R. 56(C). The moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims.*" Dresher v. Burt*, 75 Ohio St.3d 280, 293, 662 N.E.2d 264 (1996). If that burden is satisfied, "the nonmoving party then has a reciprocal burden * * * to set forth specific facts showing that there is a genuine issue for trial and, if the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Id.*; *see* Civ.R. 56(E).

{¶ 14} In *Sibby v Ownit Mortg. Solutions, Inc.*, 240 Fed. Appx 713 (6th Cir.2007), the plaintiff asserted a TILA violation arguing in part that she received only one copy of a NOTRC. She failed to respond to a request for admissions that sought acknowledgment that she received two copies. However, she testified in deposition that she had received only one copy. Although she moved to withdraw or amend the unanswered admission, the trial court denied the motion. The trial court granted summary judgment to the defendant. The court of appeals affirmed, noting that although the denial of withdrawal of the admission was not an abuse of discretion, it did not matter. The signed NOTRC form acknowledging that plaintiff received two copies created a presumption that she received two copies. The Sixth Circuit reasoned that "[p]laintiff's deposition testimony that she only received one copy [was] insufficient to rebut this presumption." *Id.* at 717, citing *Williams v. First Gov't Mortgage and Investors Corp.*, 225 F.3d 738, 751 (D.C.Cir.2000) (finding testimony by plaintiff of non-delivery insufficient to rebut presumption).

{¶ 15} The Sixth Circuit also has recently dealt with an "envelope theory," where home owners, as in this case, swear that everything they received at a closing is, and was, contained in their envelope that now contains only one NORTC. The appellate court stated: "We hold that the so-called 'envelope theory,' without more, is insufficient to rebut the presumption of proper delivery which the signed Notice creates." *Lee v. Countrywide Home Loans, Inc.*, 692 F.3d 442, 451 (6th Cir.2012). We recognize a split of federal authority as to what is necessary to rebut the statutory presumption raised by signing the two-copy delivery acknowledgment form. In *Marr v. Bank of America, N.A.*, 662 F.3d 963, 968 (7th Cir.2011), the Seventh Circuit held that "envelope theory" evidence is sufficient to rebut the statutory

presumption of delivery of the requisite forms. *Accord Cooper v. First Government Mortg. and Investors Corp.*, 238 F.Supp.2d 50, 64 (D.D.C.2002). But if the statutory presumption could be rebutted by nothing more than the borrowers' own subsequent denial of receipt, directly contradicting a form they read and signed, then the statutory presumption would have no meaning. The signed form acknowledging receipt of two copies would be no more than any other fact presented in support of summary judgment, subject to denial by a self-serving change of mind.[2] Accordingly, we choose to follow the cited Sixth Circuit cases holding that a borrower's contrary testimony, or "envelope theory" evidence, is insufficient to rebut the presumption that the defendants received sufficient copies of the required notice.

{¶ 16} Even if we assume, arguendo, that the Cintrons' evidence rebutted the statutory presumption, we find no genuine issue of material fact for trial. This is so because whether the Cintrons received one or two copies of the notice is immaterial. Notably, the Cintrons admit receiving, signing, and having an opportunity to read one copy of the notice. The possible absence of a second copy did not impair their knowledge of the right to rescind or the exercise of that right. We are unpersuaded that the possible failure to receive a second copy of the notice in this case extended the Cintrons' rescission period from three days to three years under TILA.

{¶ 17} In reaching this conclusion, we find persuasive the Fourth District Court of Appeals' opinion in *Contimortgage Corp. v. Delawder*, 4th Dist. Lawrence No. 00CA28, 2001 WL 884085 (July 30, 2001). In that case, a borrower sought rescission of a mortgage

---

[2] In a similar fashion, when a litigant submits an affidavit opposing summary judgment that, without explanation, contradicts his prior deposition testimony, that affidavit does not create a genuine issue of material fact. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47.

loan after the lender commenced foreclosure proceedings. The borrower alleged a TILA violation based on a failure to receive two copies of the notice of right to cancel. She admitted, however, that she had signed an acknowledgment of receipt of two copies. The trial court found it impossible to determine how many copies actually had been provided. It nevertheless rejected a TILA counterclaim because the borrower had been informed of her right to rescind and was not prejudiced. On appeal, the Fourth District agreed. In relevant part, it reasoned:

> Appellant argues in her assignment of error that the trial court erred by holding that the lender's failure to strictly comply with TILA was a mere technical mistake. Instead, she contends that those errors were material and extended her right of rescission for three years. For the following reasons, we disagree. Initially we note that the TILA does not require perfect notice; rather, it requires a clear and conspicuous notice of rescission rights. * * * Although Bankers may have only provided appellant and her mother with one copy of the "Notice of Right to Cancel" between them in violation of Section 226.23(b)(1), Title 12, C.F.R., that notice nevertheless "clearly and conspicuously" indicated that they possessed a right of rescission. Appellant also confirmed during the trial that the closing officer had informed them that they had three days to rescind or to cancel the transaction. Obviously, appellant was informed of and knew of her legal rights regarding rescission. We believe that these facts and circumstances sufficiently satisfy the TILA statutory requirements and, in our opinion, meet the spirit if not the precise letter of the accompanying regulations.

* * *

In sum, we agree with the trial court's conclusion that any TILA mistakes in the instant case constitute technical (if not hyper-technical) mistakes and do not violate the spirit of the law. We therefore find no error in the court's judgment that appellant could not rescind the mortgage loan. * * * [W]hatever mistakes that may have occurred in the loan closing, neither appellant nor her mother suffered any apparent prejudice. We find no evidence to show that appellant was damaged or that appellant wanted to rescind the loan. Only after appellant was in default and foreclosure proceedings had begun (approximately eighteen months after the loan closing) did appellant express her desire to rescind the loan.

*Id.* at *3-4.

{¶ 18}   Later in its ruling, the Fourth District recognized a "growing reticence on the part of Congress to have TILA applied in a rote and technical fashion which penalizes lenders in instances in which no harm to borrowers has occurred." *Id.* at *6. The *Delawder* court continued:

The judiciary has begun to take heed of these problems as well. Thus, while federal law generally requires strict compliance with TILA, some courts have noted that strict compliance does not necessarily mean "punctilious" compliance if, with only minor deviations, substantial and clear disclosure of the fact or information demanded by the applicable statute or regulation occurs. * * * Courts are beginning to recognize that borrowers should not be permitted

to use the TILA as an instrument of harassment or oppression against the lending industry. * * * Rather, the TILA provisions should be enforced with common sense and be applied without losing sight of the legislative purpose behind its enactment. * * * To do otherwise generates disrespect for the law by creating a morass of technical regulations with no connection to the human experience.

*Id.* at *6 (citations omitted).

{¶ 19} Armed with citations to contrary case law, the Cintrons argue that *Delawder* represents the minority position nationwide. Be that as it may, we are unaware of any binding authority contrary to *Delawder*. We note too that *Delawder*, while representing the minority view, does not stand in isolation. *See*, *e.g.*, *Residential Funding Co., LLC v. Thorne*, 6th Dist. Lucas No. L-09-1324, 2010-Ohio-4271, ¶40-42 (citing *Delawder* and finding no TILA violation where a borrower who was fully informed of his right to rescind had received only one notice form rather than two); *In re Jones*, 298 B.R. 451, 459 (Bankr. D.Kan. 2003), citing *In re Ramirez*, No. 01-42119-13, Adv. No. 01-7122, Order Granting Summary Judgments at 11-12 (Bankr.D.Kan. May 28, 2003).

{¶ 20} Nor are we persuaded by the Cintrons' claim that *Delawder* patently ignores the language of TILA. As set forth above, Regulation Z obligates a creditor to "deliver two copies of the notice of the right to rescind to each consumer[.]" 12 C.F.R. 226.23(b)(1). "If the required notice * * * [is] not delivered," the right to rescind extends to three years. 12 C.F.R. section 226.23(a)(3). Here, it is appellants' argument that Flagstar did not deliver two copies of the notice to both borrowers. There is no dispute, however, that the "required notice" (as

opposed to the required number of copies) was delivered to the Cintrons. Under such circumstances, we agree with *Delawder* that extending the rescission period to three years would not advance the legitimate purpose of TILA, is not required by the language of the statute, and would serve only to injure the lending institution. Therefore, regardless of how many copies of the notice the Cintrons received, we find no genuine issue of material fact as to whether they have established a TILA violation resulting in a three-year right to rescind. Because the Citrons both admitted receiving a copy of the notice and having an opportunity to read it, we conclude that the statutorily "required notice" was delivered. Accordingly, the first, second, and third assignments of error are overruled.

{¶ 21} In their fourth assignment of error, the Cintrons contend the trial court erred in awarding Flagstar summary judgment where the bank did not comply with certain conditions precedent in the mortgage document. In particular, the Cintrons cite paragraph twenty-two of the mortgage, which states:

> Lender shall give notice to Borrower prior to acceleration following Borrower's breach * * *. The notice shall specify * * * (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and a sale of the Property.

(Flagstar's Motion for Summary Judgment, Henry affidavit, Exhibit A-6 at p. 9, ¶22).

{¶ 22} The Cintrons argue that the pre-foreclosure notices sent by Flagstar were insufficient because they failed to warn about the possibility of "foreclosure by judicial proceeding." We disagree. Flagstar sent the Cintrons a number of letters advising them of

their default and warning them about possible foreclosure. Although none of the letters contained the precise phrase "foreclosure by judicial proceeding," the Cintrons were made aware of that potential outcome. Flagstar notified them that they were in default and that acceleration and foreclosure could occur. Flagstar described "foreclosure" as the "legal means" to repossess property. (*Id.* at Exh. A-10). On another occasion, Flagstar advised the Cintrons that their mortgage soon would "be referred to a foreclosure attorney who will begin legal actions * * *." (*Id.* at Exh. 37).

{¶ 23} In our view, the notices adequately advised the Cintrons about possible "foreclosure by judicial proceeding" (which is, incidentally, the only type of foreclosure available in Ohio) despite not using those exact words. We agree with the trial court that the Cintrons' argument to the contrary is "hyper-technical" and unpersuasive. The fourth assignment of error is overruled.

{¶ 24} In their fifth assignment of error, the Cintrons claim the trial court erred in awarding Flagstar summary judgment where a genuine issue of material fact exists regarding the balance due on the note. The Cintrons advances three arguments in support of their claim: (1) Flagstar representative Janet Reder was unable during her deposition "to interpret or offer any explanation of the mortgage history ledger, nor was she able to provide any verification of the fees charged to the account"; (2) Flagstar failed to mitigate its damages by not responding to a third party's offer to purchase the Cintrons' home for $178,000 as a short sale; and (3) Flagstar failed to reduce the amount due under the note by the amount it will receive through VA mortgage insurance.

{¶ 25} Upon review, we find no genuine issue of material fact regarding the balance

owed by the Cintrons under the note. During her deposition, Reder was unsure what time period each page of a "mortgage history ledger" covered. She also was unsure how many separate late fees had been assessed, but she did identify the total amount of late fees owed. Although the Cintrons complain about Reder not knowing what "specific services" were performed for the late fees, we see no reason why any services would need to be performed for a "late fee" to be charged. Reder also identified a property inspection fee and explained that the foreclosure process required an inspection by a licensed appraiser. In addition, she testified about a $60 fax fee. She presumed that it had to do with a fax regarding the payoff amount of the Cintrons' loan. Reder had no first-hand knowledge whether the Cintrons had paid the fee. She next testified about a fee charged by Wolverine Real Estate Services, Inc. She admitted not knowing what services the company had performed for the fee. Finally, Reder testified about a fee for "forced placed insurance" on the Cintrons' home and admitted lacking first-hand knowledge as to whether Flagstar had paid the fee.   (Reder depo. at 73-89).

{¶ 26}   Reder's deposition establishes that she lacked intimate familiarity with every fee charged to the Cintrons' account. Nothing in her testimony suggests, however, that the Cintrons did not owe the fees, which were included on a mortgage history ledger that included all credits and charges. During her deposition, Beth Cintron testified that she was "not aware" of any unauthorized fees or charges on her account. (Beth Cintron depo. at 69). Francisco Cintron testified similarly. (Francisco depo. at 186).   We note too that Flagstar representative Kelly Henry provided an affidavit in support of summary judgment averring that the total amount owed by the Cintrons on their note was $219,816.08 plus interest, which was the amount of the trial court's judgment in favor of Flagstar (*See* Henry affidavit at ¶28; March 1,

2012, Judgment Entry and Decree of Foreclosure). Appellants failed in their reciprocal duty under Civ. R. 56(E) to set forth specific facts showing a genuine issue for trial. We agree with the trial court that the Cintrons failed to demonstrate a genuine issue of material fact as to the amount due under the note.

{¶ 27} We also agree with the trial court that Flagstar did not fail to mitigate its damages. The record reflects that the Cintrons approached Flagstar about a short sale. Flagstar responded by sending the Cintrons certain paperwork to complete and return. The Cintrons never completed the paperwork needed to facilitate a short sale. They also demanded that Flagstar not pursue a deficiency judgment as part of any short-sale agreement. (Beth Cintron depo. at 64-65; Francisco Cintron depo. at 161-162, Exh. 44). Under these circumstances, we find no genuine issue of material fact as to whether Flagstar failed to mitigate its damages by not responding to a short-sale offer.

{¶ 28} Finally, we find no genuine issue of material fact as to whether Flagstar failed to reduce the amount due under the note by the amount it will receive through VA mortgage insurance. The record does not reflect that Flagstar necessarily will receive compensation from the VA. In any event, the record contains no evidence that Flagstar had received any VA loan-guarantee proceeds at the time of the trial court's ruling. Therefore, at that time, there was nothing for the trial court to offset against the amount due under the Cintrons' note. Accordingly, the fifth assignment of error is overruled.

{¶ 29} The judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN, J., concurs.

GRADY, P. J., dissenting:

{¶ 30} On motions for summary judgment, an affidavit of the party against whom the motion is made which does nothing more than contradict a ground for relief on which the motion relies, particularly when the issue concerned is a matter of opinion, and when standing alone is generally held insufficient to preserve a genuine issue of material fact on the matter concerned. The affidavit is then rejected as "self-serving."

{¶ 31} The affidavits of the Cintrons stating that each did not receive two copies of the Notice of Right to Rescind from the closing agency used by Flagstar Bank stated a proposition of fact, not their opinions. Further, they are entitled to rely on their personal review of the documents they were given to make their statements.

{¶ 32} Even if the Cintrons' affidavits could be viewed as self-serving, the Cintrons did not rely on their affidavits alone. They offered the testimony of Todd Mendolia, Senior Vice-President of Flagstar Bank's closing agency, that his firm received no instructions from Flagstar Bank to provide the Cintrons with the required number of notices, and that otherwise the agency would not have done so. The court was required to construe that evidence most strongly in the Cintrons favor. Civ.R. 56(C). The evidence the Cintrons offered is sufficient to preserve a genuine issue of material fact whether they were provided the required number of copies.

{¶ 33} The majority does not deny that proposition, concluding instead that even if the required number of copies of the notice were not delivered to the Cintrons, summary judgment was nevertheless proper because the Cintrons not only acknowledged in writing that they received the required notices, but further concede that they had the opportunity to read the

notice they signed. Therefore, any failure to comply with 12 CFR § 226.23(b)(1) resulted in no material prejudice to the Cintrons because the policy purposes of the regulation were satisfied. The majority relies on *Contimortgage Corp. v. Delawder*, 4th Dist. Lawrence No. 00CA28, 2001 WL 884085 (July 30, 2001), and other decisions which have held likewise.

{¶ 34} In enacting the Consumer Credit Protection Act, the Congress stated the following findings and declaration of purpose at 15 USCS § 1601:

(a) Informed use of credit. The congress finds that economic stabilization would be enhanced and the competition among the various financial institutions and other firms engaged in the extension of consumer credit would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this title [15 USCS §§ 1601 et seq.] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices.

{¶ 35} The Congress delegated to the Board of Governors of the Federal Reserve System the authority to "prescribe regulations to carry out the purposes of this title," 15 USCS § 1604(a), adding:

* * * these regulations may contain such classifications, differentiations, or other provisions, and may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Board are necessary or proper to

effectuate the purposes of this title [15 USCS §§ 1601 et seq.], to prevent circumvention or evasion thereof, or to facilitate compliance therewith.

{¶ 36}   15 USCS § 1635(a) confers a three-day right of recision on consumers who engage in credit transactions, which is exercised "by notifying the creditor, in accordance with regulations of the Board, of his intention to do so."   The form and contents of the notice prescribed by the Board and to be delivered to the consumer are set out at 12 CFR § 226.23(b)(1).   The preceding section, 12 CFR § 226.23(3), establishes  the right of recision conferred by 15 USCA § 1635(a), adding:

If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all the consumer's interest in the (secured) property, or upon sale of the property, whichever occurs first.

{¶ 37}   In *Contimortgage Corp. v. Delawder* the court reasoned that the failure to provide the consumer two copies of the notice of recision was a mere technical mistake that did not prejudice the consumer's rights because she had been otherwise informed of her right to rescind, having signed an acknowledgment that she received two copies.   Noting that the form of notice "clearly and conspicuously" indicated the right of recision, as 12 CFR § 226.23(b)(1) requires, the court concluded that the notice delivered to the consumer met the spirit if not the precise letter of the accompanying regulations, and that regulation is "hypertechnical" and the failure to comply was not material.

{¶ 38}   The holding in *Contimortgage Corp*. applies a common-law analysis to the enforcement of an administrative regulation.   Commenting on that practice, Justice Scalia

writes:

> But though I have no quarrel with the common law and its process, I do question whether the *attitude* of the common-law judge - the mind-set that asks, "What is the most desirable resolution of this case, and how can any impediments to the achievement of that result be evaded?" - is appropriate for most of the work that I do, and much of the work that state judges do. We live in an age of legislation, and most new law is statutory law. As one legal historian has put it, in modern times "the main business of government, and therefore of law, [is] legislative and executive . . . . Even private law, so-called, [has been] turning statutory. The lion's share of the norms and rules that actually govern [] the country [come] out of Congress and the legislatures . . . . The rules of the countless administrative agencies [are] themselves an important, even crucial, source of law.

* * *

In reality, however, if one accepts the principle that the object of judicial interpretation is to determine the intent of the legislature, being bound by genuine but unexpressed legislative intent rather than the law is only the *theoretical* threat. The *practical* threat is that, under the guise or even the self-delusion of pursuing unexpressed legislative intents, common-law judges will in fact pursue their own objectives and desires, extending their lawmaking proclivities from the common law to the statutory field. When you are told to decide, not on the basis of what the legislature said, but on the basis of what it

*meant*, and are assured that there is no necessary connection between the two, your best shot at figuring out what the legislature meant is to ask yourself what a wise and intelligent person *should* have meant; and that will surely bring you to the conclusion that the law means what you think it *ought* to mean - which is precisely how judges decide things under the common law.

Scalia, *A Matter of Interpretation*, Princeton University Press (1997), pp. 13, 17-18.

**{¶ 39}** That, unfortunately, is the path the *Contimortgage Corp*. court followed, on the view that literal compliance with the four-copies requirement also puts an undue burden on lenders who commit honest mistakes, potentially benefits borrowers who default on their obligations, and "exposes the mortgage industry to extraordinary liability that may threaten the solvency of the industry."[3] *Id*., at 6. *Contimortgage Corp*. also made reference to several critical views of such requirements expressed by members of Congress when the Federal Truth In Lending Class Action Relief Act was debated in 1995. Apparently, that opposition did not persuade the Congress to eliminate the requirement of two copies of the Notice of Recision imposed by the Federal Reserve Board pursuant to the 1968 Federal Consumer Credit Protection Act.

**{¶ 40}** The Congress made a finding and articulated a policy in 15 USCA 1601, *et seq*., and based on that finding chose to rely on the particular expertise of the Federal Reserve Board to "prescribe regulations to carry out the purpose of this title * * * as in the judgment of

---

[3]This parade of horribles is avoided, for practical purposes, by the requirement courts have imposed that upon recision the borrower must return or "tender back" the loan proceeds prior to termination of the lender's security interest in the property. See brief of Flagstar Bank, FSB, pp. 17-18.

the Board are necessary or proper to effectuate the purpose of this title, to prevent circumventions or evasion thereof, or to facilitate compliance therewith." 15 USCS § 1604(a). That statutory delegation leaves little or no room for the courts to vary from the procedures the Board prescribed, on the view that the regulation promulgated by the Board should have been otherwise. That, in my view, is what the holding in *Contimortgage Corp.* does, and I decline to follow it.

{¶ 41} Having found that Civ. R. 56(C) is not satisfied, I would reverse the summary judgment for Flagstar Bank, FSB on its foreclosure claim and the Cintrons' counterclaim, and remand the case for further proceedings.

. . . . . . . . . . . . .

Copies mailed to:

Scott A. King
Jessica E. Salisbury
Troy J. Doucet
Audra Lepi Tidball
Hon. Steven K. Dankof

Case Name:   *Flagstar Bank FSB v. Francisco Cintron, Jr., et al.*
Case No:            Montgomery App. No. 25110
Panel:              Grady, Donovan, Hall
Author:             Michael T. Hall
Summary: